**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

FRANK ZANDIER,                          )
                                        )
            Plaintiff,                  )          Civil Action No. 2:13-cv-459-JFC
                                        )
      v.                                )          Chief District Judge Joy Flowers Conti
                                        )
BABCOCK & WILCOX                        )
CONSTRUCTION CO. INC., *et al.,*        )
                                        )
            Defendants.                 )


## <u>MEMORANDUM OPINION</u>

CONTI, Chief Judge.

Plaintiff Frank Zandier ("Zandier") commenced this civil action against his former

employer, Babcock & Wilcox Construction Co. Inc. ("BWCC" or the "Company"), and P.W.

Waanders ("Waanders"), its former vice-president and general manager (collectively,

"defendants"),[1] asserting breach of contract and promissory estoppel claims as well as alleged

violations of Pennsylvania's Wage Payment and Collection Law ("WPCL"), 43 PA. STAT.

§§260.1 *et seq.*, based upon defendants' failure to pay certain bonus monies which Zandier

believes he was entitled to receive.[2]  Pending before the court is defendants' motion for summary

judgment (ECF No. 42) on all counts in the amended complaint (ECF No. 13).  For the reasons

that follow, defendants' motion will be granted in part and denied in part.

---

[1] The initial complaint also named as defendants Jeffrey Hines ("Hines") and Ken Wasilewski ("Wasilewski"), who
served, respectively, as operations manager and Eastern Division operations manager for BWCC during times
relevant to this lawsuit; however, Zandier's amended complaint (ECF No. 13) withdraws all claims previously
asserted against these individuals.  Accordingly, Hines and Wasilewski are terminated as defendants in this action
and the claims against them will be dismissed.

[2] This court's subject-matter jurisdiction is premised on 28 U.S.C. §1332, as the parties have diverse citizenship and
Zandier alleges an amount in controversy, exclusive of interests and costs, in excess of $75,000.

## I. Factual Background[3]

BWCC is headquartered in Barberton, Ohio, and provides construction services to utility and industrial customers. (CCSMF ¶ 1.)[4] BWCC is one of several subsidiaries of Babcock & Wilcox Power Generation Group, Inc. ("BWPGG"), which in turn is part of The Babcock & Wilcox Company. (*Id.*)

Zandier was employed by BWCC from July 1998 until his retirement on January 31, 2012. (CCSMF ¶¶ 8-9.) From at least April 1, 2009, through the date of his retirement, Zandier held the pay grade designation for Project Manager 4. (*Id.* ¶12.) As of April 1, 2010, Zandier's salary was $4,627 per pay period, or $111,048 annually, and this was also his salary when he retired. (*Id.* ¶¶ 13-14.)

During times relevant to this litigation, Zandier worked in BWCC's Pittsburgh office. (Amended Compl. ¶14, ECF No. 13.) In the course of his employment, Zandier reported to Operations Manager Tom Brauchle ("Brauchle") and later, Jeff Hines ("Hines"), who replaced Brauchle as operations manager in June or July 2008. (CCSMF ¶¶ 10, 15.) The operations manager in turn reported to BWCC's Eastern Division operations manager (also referred to as "Regional Manager"). (*Id.* ¶15.) Brad Bradford ("Bradford") served as BWCC's Eastern Division operations manager until the end of 2007 or the beginning of 2008, at which time Bradford was replaced by Ken Wasilewski ("Wasilewski"). (*Id.* ¶ 4.) The Eastern Division operation manager in turn reported to BWCC's vice-president and general manager. (*Id.* ¶15.)

---

[3] Except as otherwise indicated, the following facts are undisputed. Where disputed, the facts are construed in the light most favorable to Zandier, the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

[4] The designation "CCSMF___" refers to the parties' Combined Concise Statement of Material Facts (ECF No. 52).

Mike Morash ("Morash") served as vice-president and general manager of BWCC until Waanders took over that position on July 1, 2007. (*Id*. ¶ 2.)

## A. The Project Team Incentive Plans

At various times during Zandier's employment, BWCC participated in a Project Team Incentive Plan ("PTIP"), which was essentially a bonus plan tied to the completion of eligible construction projects. (CCSMF ¶¶ 7, 16.) The PTIP began on or about September 30, 2001, and applied to a number of BWPGG's subsidiaries, including BWCC. (*Id*. ¶ 17.) The PTIP operated as follows: (1) construction projects were selected for participation in the program; (2) select employees assigned to those projects were made eligible for the PTIP; (3) the Company forecasted an expected profit on the project; (4) if the actual profit was higher than forecasted, a portion of the excess profit was used to fund a bonus pool; and (5) eligible employees were paid a bonus from that pool. (*Id*. ¶ 18.)

In an internal email dated September 3, 2006, BWCC's parent company, BWPGG, announced to certain high level administrators of its subsidiaries its intention to implement certain changes to the PTIP. (Defs.' Ex. O at 1-3, ECF No. 45-15.)[5] The changes included three major differences between the PTIP as previously administered (hereafter, the "Old PTIP") and the program as it would be administered in the future (hereafter, the "New PTIP"). (*Id*.) First, the size of the bonus pool was changed: whereas under the Old PTIP, the bonus pool was 10% of the excess profit, the New PTIP limited the bonus pool to 5%. (CCSMF ¶ 28.) Second, the salary caps on PTIP bonuses were changed: while the Old PTIP capped the bonus payable at 100% of the employee's salary, the New PTIP cap ranged from 20% to 50% of the employee's

---

[5] Page citations to document exhibits refer to the official CM/ECF pagination appearing in the header of the document.

salary; in Zandier's case, the applicable cap under the New PTIP was 40% of his annual salary. (*Id.*) Third, a change was implemented relative to the availability of discretionary bonuses under the Salaried Employee's Incentive Plan ("SEIP"): whereas the Old PTIP had forbidden payment of a discretionary SEIP bonus for employees receiving a PTIP bonus in the same year, the New PTIP allowed employees to receive both a PTIP bonus and a discretionary SEIP bonus in the same year. (*Id.*)

The September 3, 2006, email announcement indicated BWPGG's intent "to implement the plan changes with new contracts entered on or after October 1st [2006]." (Defs.' Ex. O at 3, ECF No. 45-15.) To prevent issues of unfairness from arising in connection with the transition to the New PTIP, BWPGG advised that "projects already released prior to the effective date" of October 1, 2006, would be "subject to the existing program rules." (*Id.*)

Included in the same September 3, 2006, email string was a notification to Morash that BWCC was henceforth "suspend[ed] … from participating in the PTIP on any new contract bookings entered after this notification." (Defs.' Ex. O at1, ECF No. 45-15.) The directive was reportedly given because BWCC "had not made its forecast in eleven quarters" and BWPGG management felt that it was "inappropriate to be paying the rewards associated with [the PTIP] until that situation turned around" (*id.*); however, BWCC was advised that it could "request reinstatement in the program after re-establishing minimally acceptable financial performance." (*Id.*)

Shortly after the Old PTIP had been suspended, a replacement PTIP was in draft form. (CCSMF ¶ 22.) As of November 2007, however, a successor plan to the Old PTIP had not been finalized, and there was uncertainty throughout the remainder of 2007 about which projects would be covered. (*Id.* ¶ 23.) On September 3, 2008, a draft of the New PTIP was circulated to

key decision-makers, including Waanders, who by that time had replaced Morash as BWCC's vice president and general manager. (*Id.* ¶ 24.) The revised plan was finally approved on May 25, 2009, when the vice president and general manager of BWPGG's Fossil Power Division ("FPD") signed off on it. (*Id.* ¶ 25.) Although not formally approved until May 25, 2009, the New PTIP was made effective retroactively to October 1, 2006. (*Id.* ¶ 26.)

On or about May 16, 2007, Zandier signed PTIP initiation forms relative to two projects commissioned by Allegheny Energy. One form related to the Fort Martin FGC Project ("Fort Martin"), and the other form related to the Hatfield Ferry FGC Project ("Hatfield"). (CCSMF ¶30.) Both forms were signed by Bradford, and both forms listed the "participant's share" as "10%," meaning that Bradford was recommending that Zandier receive 10% of any bonus pool funds that might ultimately be allocated to BWCC upon completion of the projects. (Defs.' Ex. I, ECF No. 45-9; Defs.' Ex. J, ECF No. 45-10; CCSMF ¶57.)

At the time that he signed these forms, Zandier was given a copy of the Old PTIP by Brauchle, who remarked, "Here's the PTIP program." (Pl.'s Dep. 66:3; *id.* at 64-66, 142, ECF No. 45-1; Defs.' Ex. H, ECF No. 45-8.) [6] Section II of the document, entitled "Plan Elements," provided (among other things) that the "bonus pool will be defined as 10% of the improvement in the booked profit on the selected projects." (Defs.' Ex. H at 1, §II, ECF No. 45-8.) Section III of the document, "Plan Administration and Payment Determination," provided that "[i]ndividual payments will be capped at 100% of the employees' base salary at the time of payment." (*Id.* at 2, §III.) The plan also included a disclaimer, which provided: "The Company would expect to continue to administer this plan indefinitely; however, because future conditions cannot be

---

[6] Citations to deposition testimony refer to the original internal pagination in the deposition transcript, as opposed to the CM/ECF numbering which appears in the header of the referenced document.

foreseen, the company reserves the right to amend, suspend or terminate the plan at any time." (*Id.* at 3, §V.)

On or about June 25, 2007, Bradford sent paperwork, including Zandier's PTIP initiation forms, to Morash for the purpose of seeking application of the PTIP to the Fort Martin and Hatfield projects. (CCSMF ¶32.) When first initiated by Bradford, the Fort Martin and Hatfield projects were "erection only" projects. (CCSMF ¶ 36.) An "erection only" project means that BWCC is the only BWPGG subsidiary that has a contract with the customer for work, and that work is the construction of a power plant. (*Id.* ¶ 37.) By contrast, a "delivered and erected" ("D&E") project would involve BWPGG's Fossil Power Division ("FPD") performing the "delivery" part of the job, *i.e.,* the material supply component. (*Id.* ¶ 38.) With D&E projects, the extra profit bonus pool is calculated by first combining the profit for both BWCC and FPD, and then splitting the pool 50/50 between BWCC and FPD. (*Id.* ¶¶ 39-40.) The accounting group takes the information provided to it, merges the profits of the two divisions, reconciles the numbers, and then calculates payments in accordance with PTIP rules before forwarding the figures to upper management for approval. (*Id.* ¶ 42.) Although initially designated "erection only" projects, the Hatfield and Fort Martin projects subsequently became D&E projects involving both BWCC and FPD. (*Id.* ¶ 43.)

On August 24, 2011, payouts under the PTIP were approved for the Fort Martin and Hatfield projects. (CCSMF ¶ 52.) There is no dispute that BWCC ultimately administered the bonus payments for these projects under the New PTIP, rather than under the Old PTIP.

With respect to the Fort Martin project, the forecasted or booked profit was $18,476,000. (CCSMF ¶ 53.) The actual profit upon completion of the project in 2011 was $29,212,342, resulting in a profit improvement of $10,736,342. (*Id.* ¶ 54.) Applying the terms of the New

PTIP, BWCC calculated a bonus pool consisting of 5% of the profit improvement; with a positive adjustment for business development, which resulted in a total net bonus pool of $563,658. (CCSMF ¶ 55; Defs.' Ex. U at 2, ECF No. 45-21.) Because Fort Martin was a D&E project, BWCC and FPD split the net bonus pool equally, making BWCC's share of the net bonus pool $281, 829. (CCSMF ¶ 56.) In August 2011, Zandier was allocated 10% of this amount or $28,183. (CCSMF ¶ 58.)

The forecasted or "booked" profit for the Hatfield project was $25,343,000. (CCSMF ¶ 59.) The actual profit upon completion in 2011 was $40,229,873, resulting in a profit improvement of $14,886,873. (*Id.* ¶ 60.) Applying the terms of the new PTIP, BWCC calculated a bonus pool of $744,344, which was subsequently adjusted downward to reflect a net bonus pool of $707,127. (*Id.* ¶¶ 61-62.) Because Hatfield, like Fort Martin, was a D&E project, the net bonus pool was split evenly with FPD, resulting in a net bonus pool share of $353,563.50 for BWCC. (*Id.* ¶ 63.) Zandier was allocated a 10% share of these funds or $35,356.35. (*Id.* ¶ 64.)

Under the terms of the New PTIP, Zandier's PTIP payments in any given year were capped at 40% of his salary. (CCSMF ¶ 66; Defs.' Ex. P at 4, §II, ECF No. 45-16.) Applying this provision, BWCC awarded Zandier a total of $44,419.20 (*i.e.* 40% of his $111,048 annual salary) in September 2011 for his participation in the Fort Martin and Hatfield projects. (CCSMF ¶ 69.) Of this amount, $28,183 represented Zandier's PTIP payment for the Fort Martin project and $16,236.20 represented Zandier's PTIP payment for the Hatfield project. (Defs.' Ex. V, ECF No. 45-22.)

Zandier was anticipating a higher PTIP payout in accordance with the terms of the Old PTIP and, following his receipt of the payments, he made inquiries about the program. (Zandier

Dep. 73:9-74:1, 74:19-75:7, ECF No. 45-1.) He claims it was at this point, sometime in the fall of 2011 toward the end of his employment, that he first learned about the changes to the PTIP that the Company had formally adopted in May 2009. (Zandier Dep. 52:5-55:4, 55:13-24, 66:4-13.) Zandier claims he was never shown or advised about the September 3, 2006, email announcing changes to the plan and suspending BWCC from participation in the Old PTIP. (*Id.* at 53:22-54:4, 57:17-59:13.) In addition, he was never given any copy of the plan other than the Old PTIP document provided to him in May 2007. (*Id.* at 62:4-5.) Zandier argues that BWCC breached its contractual obligations to him when it paid his PTIP bonus under the new plan rather than under the old one.

### B. The Salaried Employees Incentive Program

At times relevant to this lawsuit, BWCC maintained a plan known as the Salaried Employees Incentive Plan ("SEIP"). (CCSMF ¶ 7.) The SEIP was a corporate yearly bonus program paid to salaried employees of BWPGG, including employees of BWCC. (CCSMF ¶ 70.) SEIP bonuses were payable on or about March 15 of each year for the previous calendar year. (*Id.* ¶ 71.) The plan included a discretionary component as well as a nondiscretionary component. (*Id.* ¶ 72.) All employees who earned a SEIP bonus got the nondiscretionary payment. (*Id.* ¶ 73.) Supervisors were responsible for allocating SEIP bonuses. (*Id.* ¶ 74.)

According to an internal corporate document submitted to "SEIP Allocation Managers" in February 2012, "SEIP is a hybrid plan combining profit-sharing and discretionary bonus principles." (CCSMF ¶ 78; Defs.' Ex. N at 1, ECF No. 45-14.) While all service-eligible employees share the nondiscretionary awards, "[t]he discretionary amounts … are intended to be awarded disproportionately to the people who exceed goals and contribute the most to [the] operating unit's success." (*Id.*) Managers were directed to "ensure that higher rewards go to

employees whose position and performance really make a difference to the company's profitability." (*Id.*).

According to the 2011 SEIP guidelines:

[d]iscretionary amounts are to be differentiated between employees. Higher rewards are to go to employees who have made a difference to the company's profitability and who are higher performers. Discretionary amounts are intended to be awarded disproportionately to the people who exceed goals and contribute the most to the operating unit success.

(Defs.' Ex. N at 2, ECF No. 45-14; *see* CCSM ¶ 78.)

For his work during the calendar years 2004 through 2010, Zandier was generally awarded SEIP benefits in an amount ranging from $3,762 to $7,424. (Defs.' Ex. GG at 4, ECF No. 51-1.)[7] The one exception was 2005, for which Zandier was not awarded any SEIP monies. (*Id.*) For the year 2011, which was his last full year of employment with BWCC, Zandier was paid only $1,538, representing the nondiscretionary portion of his SEIP award; he was awarded nothing for the discretionary component. (CCSMF ¶79, Defs.' Ex. FF, ECF No. 45-32.) Zandier's overall performance rating for 2011was 3.96, indicating that he generally "exceed[ed] requirements." (Pl.'s Ex. C at 3, ECF No. 47-3.) Hines testified that Zandier was "very much a part" of the Company's effort that year to secure a project in Berlin, New Hampshire, known as the "Berlin" project. (Hines Dep. 20:13-21:4, ECF No. 45-3.) To that end, Hines commented on Zandier's performance evaluation that Zandier's "efforts in the past year related to the Berlin project were critical to the ultimate success of that effort.... Its [sic] clear his contribution to our EPC proposal effort were [sic] significant and we can clearly benefit from his participation on

---

[7] The itemization of SEIP awards as reflected in defendants' Exhibit GG appears to list the year in which the monies were actually awarded; the parties agree that the awards correspond to the employee's performance in the previous calendar year. (*See* CCSMF ¶ 71.)

future, similar efforts." (Pl.'s Ex. C at 3, ECF No. 47-3.)[8] Nevertheless, Hines testified that

Zandier's retirement in January 2012 had a bearing on his SEIP award for 2011 and outweighed

his performance evaluation for purposes of the discretionary component. (Hines Dep. 18:23-

19:7, ECF No. 45-3.) Zandier contends that BWCC breached its contractual obligations to him

by denying him a discretionary SEIP award.

### C.  The Voluntary Reduction in Force Plan

In October 2009, BWCC's parent corporation announced a need to reduce the size of its

salaried work force due to "economic conditions and the continued decline in new bookings for

[BWPGG]." (Defs.' Ex. L at 1, ECF No. 45-12.) To facilitate the reduction, BWCC, through

BWPGG, offered a Voluntary Reduction in Force ("VRIF") option to employees ages 60 and

older who would have had at least five years of employment with the Company by the end of

2009. (CCSMF ¶¶ 7, 81.) Because Zandier fit these criteria, the VRIF option was offered to

him. (*Id.* ¶ 82.) Under the terms of the VRIF option, employees who volunteered for the

reduction in force would receive enhanced severance benefits, including severance pay equal to

six months of the employee's salary, which was not normally offered in the case of a voluntary

termination of employment. (*Id.* ¶ 81; *see* Defs.' Ex. L at 1, ECF No. 45-12.)

As of October 2009, Zandier anticipated that his PTIP award on the Fort Martin and

Hatfield projects would be near the amount of his salary ($116,402) or possibly more. (Zandier

Dep. 20:1-7, 131:17-25, ECF No. 45-1.) He ultimately declined the VRIF option based on the

mistaken belief that, if he exercised that option, he would lose his eligibility for the PTIP bonus

money. (*Id.* at 49:23-50:2, 50:18-21.) Zandier formed this impression from language in the Old

---

[8] By the time of Zandier's 2011 performance rating, Hines had been promoted to the position of Eastern Division
operations manager. (Hines Dep. 7:1-5, ECF No. 45-3.)

PTIP document that was given to him, which provided that "[a] participant who is laid-off or elects normal retirement will receive a pro-rata share of the bonus if the project earns a bonus," while "[a] participant who is terminated for cause or resigns (prior to the end of the project) will forfeit any portion of an unpaid bonus." (Defs.' Ex. H at 2, ECF No. 45-8.) In addition, the PTIP initiation forms he signed in May 2007, provided that "[t]ermination of employment (other than lay-off) will automatically terminate participation in this plan and result in forfeiture of any share in the bonus pool." (Defs.' Ex. I, ECF No. 45-9; Defs.' Ex. J, ECF No. 45-10; *see* CCSMF ¶ 88.) Zandier acknowledges that no one ever told him that participating in the VRIF would render him ineligible for the PTIP, and he never made any inquiries along those lines; rather, he made the assumption about ineligibility based solely on the PTIP document language. (Zandier Dep. 50:23-51:19, ECF No. 45-1.) Zandier claims that, because of his reliance on the language in the PTIP document, he lost out on his opportunity to partake in the VRIF.

## II. Procedural History

On March 5, 2013, Zandier filed suit against BWCC, Hines, Wasilewski, and Waanders in the Allegheny Court of Common Pleas. (Notice of Removal ¶ 1, ECF No. 1.) Zandier's complaint asserted sixteen causes of action against the foregoing defendants based on theories of breach of contract, promissory estoppel, and alleged violations of the WPCL. (Notice of Removal Ex. A, ECF No. 1-2.)

On March 27, 2013, BWCC removed the state court action to this court.[9] (*See* Notice of Removal, ECF No. 1.) Zandier subsequently filed an amended complaint (ECF No. 13), which

---

[9] As of the date of removal, the individual defendants had not yet been served with the state court complaint and therefore did not consent to removal; however, as BWCC pointed out in its notice, this lack of consent did not serve as a bar to removal. (*See* Notice of Removal ¶ 8 n.2 (citing *Lewis v. Rego Co.,* 757 F.2d 66, 68 (3d Cir. 1985) (removal petition is effective when a nonresident defendant has not been served at the time the removing defendants

constitutes the operative pleading in this matter. In his amended complaint, Zandier withdrew all claims previously asserted against Hines and Wasilewski and one claim previously asserted against Waanders. (*See supra* note 1.)

Based on these amendments, Zandier now asserts nine separate claims designated as Counts 1-7, 14 and 15 in his amended complaint (ECF No. 13). These various claims are premised upon four general theories. In counts 1, 5, and 14 he asserts breach of contract claims against BWCC (Count 1) and alleged violations of the WPCL by BWCC (Count 5) and Wanders (Count 14). Each of these claims is based on the theory that BWCC breached its contractual obligations to Zandier when it paid him his PTIP bonus for the Fort Martin project in accordance with the terms of the New PTIP rather than the Old PTIP. In similar fashion, Counts 2, 6, and 15 assert breach of contract claims against BWCC (Count 2) and allege violations of the WPCL against BWCC (Count 6) and Waanders (Count 15). These claims are all based on the theory that BWCC breached its contractual obligations to Zandier when it paid him his PTIP bonus for the Hatfield project in accordance with the terms of the New PTIP rather than the Old PTIP. Counts 3 and 7are directed against BWCC and contain, respectively, a breach of contract claim and a violation of the WPCL based upon BWCC's failure to award Zandier a discretionary SEIP bonus for the year 2011. In Count 4 Zandier asserts a promissory estoppel claim against BWCC based upon the theory that Zandier declined to exercise his VRIF option in reliance on BWCC's errant representations that an employee's participation in the VRIF would render that employee ineligible for PTIP bonuses.

---

file their petition, provided that the removal petition alleges that the defendants who did not join in it were not served in the state proceeding)).)

On May 5, 2014, BWCC and Waanders filed the pending motion and supporting documents in support of their request for summary judgment on all remaining counts in the amended complaint. (ECF Nos. 42, 43, 44, and 45.) Zandier filed his materials in opposition to the motion on June 5, 2014. (ECF Nos. 46, 47, 48, 49.) Defendants filed their brief and appendix in reply on June 26, 2014. (ECF Nos. 50, 51.) In addition, a combined concise statement of material facts was filed on July 3, 2014. (ECF No. 52.) Consequently, the arguments raised in defendants' motion are ripe for disposition.

### III. Standard of Review

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

*Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir.2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could

rationally find in favor of the non-moving party in light of his burden of proof." (citing

*Anderson*, 477 U.S. at 248; *Celotex Corp.*, 477 U.S. at 322–23)).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. *Woodside v. Sch. Dist. of Phila. Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir.2001); *Doe v. Cnty. of Centre*, 242 F.3d 437, 446 (3d Cir.2001); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 151 (3d Cir. 1999).

## IV. Discussion

Zandier's amended complaint, as noted, asserts claims for alleged breach of contract, violations of the WPCL, and promissory estoppel. Because the breach of contract and WPCL claims are related and arise from the bonus payments made under the SEIP and PTIP, the court will collectively address these claims.[10]

---

[10] As a federal court sitting in diversity, this court must apply the substantive law of the state in which this court sits, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), including its choice of law rules, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Here, the parties have implicitly agreed that Pennsylvania law governs the contractual and promissory estoppel claims at issue in this case, as they discuss only Pennsylvania law in their respective briefs. Accordingly, the court need not engage in a choice-of-law analysis. *See Schiavone Constr. Co. v. Time, Inc.*, 735 F.2d 94, 96 (3d Cir.1984)) (because the parties appear to implicitly agree on the applicable choice of law, this Court will not challenge their decision.); *84 Lumber Co., L.P. v. Bryan Const. Co.*, Case No. 2:09–cv–1030, 2011 WL 666209, at *5 (W.D. Pa. Feb. 14, 2011) ("In this case, the parties do not dispute that Pennsylvania law applies to this case, and the Court need not engage in a choice of law analysis."); *Tyler v. King*, 496 A.2d 16, 21 (Pa. Super. Ct. 1985) ("[P]arties may bind themselves, even by a statement made in court, on matters relating to individual rights and obligations, so long as their stipulations do not affect the court's jurisdiction or due order of business.").

## A. Zandier's Breach of Contract and WPCL Claims

"'Generally, the underlying purpose of the WPCL is to remove some of the obstacles employees face in litigation by providing them with a statutory remedy when an employer breaches its contractual obligation to pay wages.'" *Voracek v. Crown Castle USA Inc.,* 907 A.2d 1105, 1109 (Pa. Super. Ct. 2006) (quoting *Oberneder v. Link Computer Corp.*, 674 A.2d 720, 722 (Pa. Super. Ct. 1996)).[11] "'The WPCL does not create an employee's substantive right to compensation; rather, it only establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement.'" *Gordon v. Maxim Healthcare Serv., Inc.,* Civil Action No. 13–7175, 2014 WL 3438007, at *3 (E.D. Pa. July 15, 2014) (quoting *Hartman v. Baker*, 766 A.2d 347, 352 (Pa. Super. Ct. 2000) (quoting *Banks Eng'g Co., Inc. v. Polons*, 697 A.2d 1020 (Pa. Super Ct. 1997)); *see Oberneder*

---

In any event, however, the court finds no reason to apply different law to the facts of this case. As a general matter, "Pennsylvania courts give effect to choice of law provisions when the state selected enjoys a substantial relationship to the parties or the transaction and the application of the law is not contrary to the public policy of another state with a stronger interest in the transaction." *Verizon Commc'ns Inc. v. Pizzirani*, 462 F. Supp. 2d 648, 655 (E.D. Pa. 2006) (citing *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir.1994)) (footnote omitted). In this case, Pennsylvania has a substantial connection to the parties and the transaction because Zandier was employed at relevant times in BWCC's Pittsburgh office, and substantial aspects of the alleged contract formation and performance occurred in Pennsylvania. In addition, neither side has alleged that the application of Pennsylvania law would contravene the public policy of another state with stronger ties. Accordingly, all claims asserting breach of contract or promissory estoppel will be analyzed under Pennsylvania law.

[11] To that end, the statute provides that "[e]very employer shall pay all wages … due to his employes on regular paydays designated in advance by the employer." 43 PA. STAT. §260.3(a). Moreover, "[a]ll wages… earned in any pay period shall be due and payable within the number of days after the expiration of said pay period as provided in a written contract of employment or, if not so specified, within the standard time laps customary in the trade or within 15 days from the end of such pay period." *Id.* The WPCL affords a private right of action to, among others, "any party to whom any type of wages is payable." *Id.* §260.9a(a). In addition to allowing for the recovery of unpaid wages, the WPCL authorizes the recovery of liquidated damages in certain cases and mandates an award of attorney fees to successful plaintiffs. *Id.*§§206.9a(f), 260.10.

"Wages" are defined under the WPCL to include "all earnings of an employe, regardless of whether determined on time, task, piece, commission or other method of calculation." 43 PA. STAT. §260.2a. In his amended complaint, Zandier alleges that the PTIP and SEIP bonus monies at issue in this case constitute "wages" within the meaning of the WPCL. (*See* Amended Compl. ¶¶ 83, 88, 93, 110, 120, ECF No. 13.) Defendants do not appear to contest this assertion.

*v. Link Computer Corp.*, 696 A.2d 148, 150 (Pa. 1997) ("The Wage Payment and Collection Law provides employees a statutory remedy to recover wages and other benefits that are contractually due to them.") (citing *Killian v. McCulloch*, 850 F.Supp. 1239, 1255 (E.D. Pa. 1994).

A "'prerequisite for relief under the WPCL is a contract between employee and employer that sets forth their agreement on wages to be paid.'" *Blackwell-Murray v. PNC Bank,* 963 F. Supp. 2d 448, 470 (E.D. Pa. 2013) (quoting *Scott v. Bimbo Bakeries, USA, Inc.*, No. Civ. A. 10–3154, 2012 WL 645905, at *4 (E.D. Pa. Feb. 29, 2012)); *see Weldon v. Kraft, Inc.,* 896 F.2d 793, 801 (3d Cir. 1990) ("The contract between the parties governs in determining whether specific wages are earned."). While bonus payments are recoverable under the WPCL, 43 PA. STAT. §260.2a, it is the plaintiff's burden to prove that the bonus is "earned," *i.e.* "that the right to the wage or bonus vested under the terms of employment." *Blackwell-Murray,* 963 F. Supp. 2d at 470 (citing authority).

The operative question for the purpose of the WPCL and breach of contract claims is whether BWCC had any contractual obligation to pay a PTIP bonus and SEIP bonus in the amount to which Zandier claims entitlement. BWCC contends that no contractual obligation exists and that Zandier's claims therefore fail as a matter of law. The court will consider this argument as it relates first to the PTIP payments and then to the SEIP payments.

1. Payments Made Under the PTIP

In Counts 1, 2, 5, 6, 14, and 15 of his amended complaint, Zandier claims that BWCC was contractually obligated to pay him bonus monies for work performed on the Fort Martin and Hatfield projects pursuant to the terms of the Old PTIP. As noted, the terms of the Old PTIP were more favorable to Zandier inasmuch as the bonus pool was 10% (rather than 5%) of profit improvement, and the cap was 100% of salary (rather than 40%). There is no dispute that

16

BWCC paid Zandier a bonus for this work in accordance with the terms of the New PTIP. Zandier does not appear to dispute the accuracy of BWCC's calculations under the terms of the New PTIP, with the sole exception (addressed in more detail below) that he asserts the Fort Martin and Hatfield projects were completed in different calendar years and, therefore, the bonus allocations relative to those two projects should not have been aggregated for purposes of applying the salary cap. The primary question is whether BWCC had a contractual obligation to pay Zandier a bonus in accordance with the terms of the Old PTIP.

In order to prevail on a breach of contract claim under Pennsylvania law, a plaintiff must establish "(1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resulting damages." *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. Ct. 2006); *see Amerex Envtl. Tech., Inc. v. Foster*, Civil Action No. 11-349, 2012 WL 6552828, at *3 (W.D. Pa. Dec. 14, 2012). While the parties are in disagreement over Zandier's claim that he has enforceable contractual rights, both sides agree that the Old PTIP has the indicia of a unilateral contract.

The concept of unilateral contracts in the context of employment cases has been explained as follows:

"A unilateral contract is a contract wherein one party makes a promissory offer which calls for the other party to accept by rendering a performance. In the employment context, the communication to employees of certain rights, policies and procedures may constitute an offer of an employment contract with those terms. The employee signifies acceptance of the terms and conditions by continuing to perform the duties of his or her job; no additional or special consideration is required. Thus, the provisions comprising the unilateral contract may be viewed as 'a contract incidental or collateral to at-will employment.' An employer who offers various rewards to employees who achieve a particular result or work a certain amount of overtime, for example, may be obligated to provide those awards to qualifying employees, although retaining the right to terminate [the employees from their jobs] for any or no reason."

*Baron v. Quad Three Group, Inc.,* No. 221 MDA 2012, 2013 WL 3822134, at *6 (Pa. Super. Ct. Jan. 22, 2013) (quoting *Caucci v. Prison Health Servs. Inc.,* 153 F. Supp. 2d 605, 611 (E.D. Pa. 2001)). "[A] unilateral contract is not formed and is, thus, unenforceable until such time as the offeree completes performance." *First Home Sav. Bank v. Nernberg,* 648 A.2d 9, 14 (Pa. Super. Ct. 1994). An offeree's power to accept an offer terminates upon revocation by the offeror. *Golkow v. Esquire Deposition Servs., LLC*, Civil Acton No. 07–3355, 2009 WL 3030218, *4 (E.D. Pa. Sept. 23, 2009). "As with bilateral contracts, a party seeking to terminate a unilateral contract must provide 'clear and unambiguous' notice." *Id*. (quoting *Maloney v. Madrid Motor Corp*., 122 A.2d 694, 696 (Pa. 1956)).

Various courts in Pennsylvania, applying these principles, have found contractual employment terms that were collateral to an employee's "at will" employment arrangement. *See, e.g., Braun v. Walmart Stores, Inc.,* 24 A.3d 875, 945 (Pa. Super. Ct. 2011) (employee handbook containing employer's policies as to rest breaks, off-the-clock work and meal breaks, which were reinforced by employer's corporate-wide policies and orientation sessions in which the handbook was disseminated and signed for by hourly employees, resulted in a unilateral contract); *Ryan v. Prudential Ins. Co. of Am.,* No. Civ. A. 03-CV-1674, 2004 WL 2406689, at *2 (E.D. Pa. Oct. 26, 2004) (plaintiff sufficiently pled the existence of a contract where the complaint alleged that the employer's sales compensation plan constituted an offer to pay bonuses for the plaintiff's continued performance and the plaintiff allegedly accepted the offer by performing his obligations); *Pilkington v. CGU Ins. Co.,* No. Civ. A. 00-2495, 2000 WL 33159253, at *7 (E.D. Pa. Feb. 9, 2001) (employer's retention program created separate unilateral contracts for each incentive period which conditioned acceptance upon the employee's continued employment throughout the respective incentive period; by remaining employed through three of the incentive

18

periods, plaintiff became entitled to accrued bonus money for those periods); *see also Bauer v. Pottsville Area Emergency Med. Servs., Inc.*, 758 A.2d 1265, 1269 (Pa. Super. Ct. 2000) (an employer's communication to employees of certain rights may constitute an offer of a contract with those terms which the employee may accept by continuing to perform the duties of his job without a need for additional or special consideration).

In this case, Zandier appears to be arguing that BWCC's actions in providing him a copy of the Old PTIP and signing him up for the plan in connection with the Fort Martin and Hatfield projects constituted an offer to form a unilateral contract that was accepted and, thus, legally enforceable, once performance occurred. Defendants deny that that the actions of BWCC's managers evidence the creation of an enforceable contract. To the extent BWCC did make an offer to enter into an enforceable unilateral contract, defendants argue that the offer was properly revoked prior to the completion of performance under the plan. Defendants maintain that the Company properly administered Zandier's bonus award under the New PTIP based on the fact that the project was "fully released" after the "cut-off date" of October 1, 2006.

Initially, the court will address defendants' argument that the purported contract lacks sufficient clarity to be enforceable. Defendants insist that the actions of BWCC's managers in having Zandier execute sign-up forms and providing him a copy of the Old PTIP do not evidence the creation of a contract. According to defendants, the forms signed by Zandier were not intended as a contract even when the Old PTIP was in place; instead they "were designed to provide notice to the employees that they were potentially in the PTIP program and initiate a dialogue among the PTIP's administrators about the project's proposed participation in the PTIP program." (Defs.' Br. Supp. Mot. Summ. J. 10, ECF No. 43.) To "highlight the preliminary nature of the documents" (*id.*), defendants note that the forms signed by Zandier identify each

19

project as "erection only" projects, yet both Fort Martin and Hatfield were eventually approved for participation as D&E projects. (See Defs.' Ex. I, ECF No. 45-9; Defs.' Ex. J, ECF No. 45-10). When Bradford (then the Eastern Division operations manager of BWCC) sent the signed forms to the Company's general manager in June 2007, he acknowledged that they needed to be approved. (Defs.' Ex. Q at 1, ECF No. 45-17; CCSMF ¶32.) Defendants reason that, because the sign-up forms lack sufficient clarity about the alleged contract terms, no intent to be contractually bound can be inferred on the part of BWCC.

Sufficiently definite terms are a necessary condition to formation of a contract. *Legendary Art, LLC,* 888 F. Supp. 2d at 585. "An agreement is sufficiently definite if it indicates that the parties intended to make a contract and if there is an appropriate basis upon which a court can fashion a remedy." *Stephan v. Waldron Elec. Heating and Cooling LLC,* 100 A.3d 660, 665 (Pa. Super. Ct. 2014) (citing *Greene v. Oliver Realty, Inc.,* 526 A.2d 1192 (Pa. Super. Ct. 1987)). It is likely true that the initiation forms signed by Zandier do not, by themselves, satisfy this standard; however, the forms must be viewed in conjunction with the copy of the Old PTIP that was provided to Zandier contemporaneously with his execution of the forms (and contemporaneous with the representation that this document was "the PTIP program").

The Old PTIP document provides considerable detail concerning the terms of the program. It addresses the kinds of projects that will be eligible for the PTIP program and reserves the decision-making in this regard to the various heads of BWPGG's divisions. (Defs.' Ex. H at 1, §§I and II, ECF No. 45-8.). It addresses the manner in which initial project profit level will be handled. (*Id*. §II.) It defines the bonus pool as "*10% of the improvement in the booked profit on the selected projects*" and provides for the adjustment of the pool based on

performance factors. (*Id.* (emphasis supplied).) The Old PTIP document also addresses the

mechanics of the plan administration and payment determination as follows:

> The selection of the project will occur at the proposal stage when the proposal is approved by B&W management, or as soon as possible after award. Once the proposal is accepted the key members of the project team will be invited to participate in the Project Team Incentive Plan. Invitees are free to decline participation. Both salary and hourly project leaders will be eligible for participation. Typically the project team will include the Regional Construction Manager, Project Director, Project Manager, Project Superintendent or other project site personnel as identified by the operations manager and division head. Each participant will be assigned a share of the bonus pool at the start of the project.

> Forms identifying the project, booked profit, participants [sic] share and the percentage of completion will be submitted for approval by division head and forwarded to Human Resources at the beginning of the project. Upon project completion the controller will verify the project results.

> \*\*\*

> Project completion will be defined as when final payment is received and all contractual obligations have been met to the satisfaction of the customer. In cases where protracted disputes exist, preventing final payment or in cases where significant G-order work is required, but a payout is otherwise evident under the terms of the plan, the President of B&W will determine the amount and timing of the bonus payment.

> The payment amounts will be calculated including deductions for performance factors and additions for client satisfaction. The payment amounts will be circulated for approval up through division head and Director, Administration. *Individual payments will be capped at 100% of the employees' base salary at the time of payment.*

(Defs.' Ex. H, at 2, §III (emphasis supplied), ECF No. 45-8.)

The Old PTIP document that was provided to Zandier is clear and definite enough in its

terms that it could reasonably be viewed as an offer to form a unilateral contract. While the

bonus awards were subject to various contingencies under the terms of the plan, such as approval

of the initiation forms, the existence of a resulting profit improvement, adjustments for

performance factors and client satisfaction, discretionary accounting issues, and the like, those

21

contingencies are not necessarily preclusive of a valid contract. The contingencies, which ultimately affected whether the participant would receive an award and how much he or she would receive, can reasonably be construed as conditions precedent to a contractual obligation to pay. *See Davis v. Government Employees Insurance Co.,* 775 A.2d 871, 874 (Pa. Super. Ct. 2001) (noting that a "condition precedent" is defined as "a condition which must occur before a duty to perform under a contract arises").

Defendants nevertheless argue that Zandier could not have been validly signed up for the Old PTIP in May 2007 because, as of that time, no PTIP existed and, in any event, BWCC had been suspended from participating in the PTIP. Consequently, defendants assert that BWCC's managers had no authority to offer the Old PTIP terms to Zandier. This line of argument gives rise to numerous issues of fact that cannot be definitively resolved on this record, making summary judgment inappropriate at this juncture.

With respect to defendants' assertion that Zandier could not have acquired contractual rights under the Old PTIP because that program was effectively terminated in September 2006, the record could support a contrary inference. For example, it is apparent from BWPGG's September 3, 2006, email announcing the intended changes to the PTIP that certain projects would be "grandfathered" under the Old PTIP. The email indicates that plan changes would be implemented with respect to "new contracts entered on or after October 1st", 2006. (Defs.' Ex. O at 3, ECF No. 45-15.) Similarly, the email notifying BWCC about its suspension from the Old PTIP indicates that the suspension would relate to "new contract bookings entered after [September 3, 2006]." (*Id.* at 1.) Zandier points to an apparent stipulation by defendants that the effective date of BWCC's contract relative to the Hatfield project was July 2006, and the effective date of BWCC's contract relative to the Fort Martin project was April 2007. (*See*

Waanders Dep. 26, ECF No. 45-2.)  Elsewhere, the record suggests that both projects were "partially booked" as of May 2006.  (Defs.' Ex. Z at 2, ECF No. 45-26.) [12]  In addition, internal corporate communications suggest that there was uncertainty among BWCC's management about which projects would be covered by the Old PTIP, even after October 1, 2006.  (Defs.' Ex. AA, ECF No. 45-27, Ex. BB, ECF No. 45-28.)  Construing the present evidentiary record most favorably to Zandier, a factfinder could reasonably infer that the Old PTIP continued to have vitality with respect to certain "grandfathered" projects even after October 1, 2006, and that the Fort Martin and Hatfield projects fell within the category of projects that were intended to be grandfathered.

Even if BWCC is correct that the Old PTIP had effectively been abandoned after October 1, 2006, and that BWCC was suspended from that plan, these circumstances would not necessarily preclude a valid breach of contract claim.  Here, there is evidence to suggest that Bradford was aware of BWCC's suspension from the Old PTIP, because he was copied on the September 3, 2006, email notification that was sent to Morash advising BWCC about its suspension. (*See* Defs.' Ex. O at 1, ECF No. 45-15.)  Bradford's actions in subsequently executing PTIP forms on behalf of Zandier at a time when the Company had been ostensibly suspended from the old plan and no new plan was formally in place raise issues about whether BWCC, through its agents, committed a unilateral mistake in offering the Old PTIP terms to Zandier.  Under Pennsylvania law, a unilateral mistake of fact does not constitute grounds for the mistaken party to rescind an otherwise valid contract.  *See A.S. v. Office for Dispute Resolution,*

---

[12] Defendants maintain that "booking" is a term of art which does not relate to when the project is under contract, but when the project has been fully recognized from a financial standpoint within the company. (Defs.' Reply Br. 7, ECF No. 50.)  There is ambiguity with respect to this point and with respect to the meaning and effect of the September 3, 2006, emails.

88 A.3d 256, 266 (Pa. Commw. Ct. 2014) ("[I]f a mistake is unilateral, there is no basis for rescinding a contract if the unilateral mistake 'is not due to the fault of the party not mistaken but rather to the negligence of the party who acted under the mistake.'") *(quoting Holt v. Dep't of Public Welfare,* 678 A.2d 421, 423 (Pa. Commw. Ct. 1996)).

Even if BWCC's managers lacked actual authority to offer Zandier the Old PTIP terms as of May 2007, questions arise on this record about whether they could nevertheless have created a binding legal obligation on the part of BWCC under the doctrines of apparent authority or agency by estoppel. "Apparent agency exists where the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act." *V-Tech Servs., Inc. v. Street,* 72 A.3d 270, 278 (Pa. Super. Ct. 2013). "Authority by estoppel occurs when the principal fails to take reasonable steps to disavow the third party of their belief that the purported agent was authorized to act on behalf of the principal." *V-Tech Servs., Inc.*, 72 A.3d at 278. This latter type of agency "contains the elements that the principal intentionally or carelessly caused a third party to believe an agency relationship existed, or knowing that the third party held such a belief, did not take reasonable steps to clarify the facts. Additionally, there must be justifiable reliance by the third party." *Id.* at 279.

Here, it is undisputed that Bradford's job responsibilities as regional operations manager included initiating the PTIP process by making recommendations about who would be included in the PTIP program. (CCSMF ¶ 21.) There is evidence to suggest that Waanders was aware that Bradford had offered the PTIP to Zandier and that he advised Bradford that Bradford should not have made the offer. (Waanders Dep. 28:1-22, ECF No. 45-2.) Despite this awareness, Waanders admittedly never conferred with Zandier about the initiation forms he signed and

Waanders did not direct Bradford to obtain an acknowledgment from Zandier that his participation in the Old PTIP was not viable. (*Id.* at 28:23-25, 29:1-5.)

The existence of an agency relationship is a question of fact. V-*Tech. Servs., Inc.,* 72 A.3d at 278. Given the present state of the record, defendants did not demonstrate the absence of a genuinely disputed issue of fact relative to agency and, consequently, the court is not in a position to decide these issues as a matter of law.

Defendants urge this court to find, as a matter of law, that Zandier's bonus payments for the Fort Martin and Hatfield projects were properly administered under the New PTIP program based upon the Company's internal policies. Defendants maintain that, when the Company instituted the new PTIP and made it retroactive to October, 1, 2006, that meant that the Company had to decide which projects fell under the Old PTIP and which fell under the New PTIP. According to defendants, the "dividing line" utilized by the Company was the date when the project was "fully released." Waanders testified that this concept focused on when the project was financially recognized within the Company:

> Q. What does the term full release mean?
>
> A. Well, I suspect there were a number of criteria, but one being that we had to actually book the project in the construction company.
>
> Q. And when you say booked, does that mean it was under contract?
>
> A. That we had finally recognized it inside the company as a full booking of the project. So not $100,000 for a $10 million project, but a $10 million booking for the project. And that would have had to have occurred, probably, inside of BWCC, not in FPD because we would book projects potentially later than what FPD would book them.

(Waanders Dep. 25:14-26:1, ECF No. 45-2.) Waanders' testimony is consistent with an internal corporate memorandum which he sent to other administrators in November 2007 and in which he

suggested that BWCC would administer the New PTIP program in the following manner: (1) the Company would "[a]ssume a 'cut-off' date of October 1, 2006 between the old program and the new program"; and (2) the Company would "[a]ssume that all projects in 'full release' prior to the cut-off date will be subject to the old program and all projects with 'full release' after the cut-off date will be under the new program." (Defs.' Ex. Z at 1, ECF No. 45-26.) Defendants explain that the Fort Martin and Hatfield projects were administered under the New PTIP because they were not "fully released" until April 2007, *i.e.*, after the October 1, 2006 "cut off" date. (*See id.,* at 2.)

Even accepting this evidence at face value, at most it demonstrates BWCC's corporate intent about how the PTIP programs should have been administered; however, in discerning contractual intent, it is what the parties objectively manifest, not what they privately intend, that evidences the terms of the agreement. *Barton v. Hewlett-Packard Co.*, Civil Action No. 13-554, 2014 WL 6966986, at *5 (W.D. Pa. Dec. 9, 2014) ("'In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter.'") (quoting *California Sun Tanning USA, Inc. v. Electric Beach, Inc.*, 369 F. App'x 340, 346–47 (3d Cir. 2010)); *Ingrassia Const. Co., Inc. v. Walsh*, 486 A.2d 478, 483 (Pa. Super. Ct. 1984) ("[I]t matters not whether [the defendant] truly believed a contract did not exist if his manifested intent reasonably suggested the contrary to [the plaintiff]. Furthermore, a contract could be formed even if [the defendant] did not contemplate that legal consequences would attach to the transaction."). Notably, Zandier denies that this corporate policy about how the New PTIP would be administered was made known to him at any time prior to the fall of 2011 when he received his PTIP payment under the terms of the new plan.

Defendants argue that, even if BWCC made an offer to form a unilateral contract, that offer was validly revoked prior to completion of performance and, therefore, it never became an enforceable obligation. Relatedly, they argue that the Old PTIP was validly terminated in accordance with the disclaimer provision in the Old PTIP document, pursuant to which BWCC "reserve[d] the right to amend, suspend or terminate the plan at any time." (Defs.' Ex. H at 3 §V, ECF No. 45-8.)

Assuming that this provision afforded BWCC the unilateral right to modify or terminate the agreement without Zandier's consent, Zandier contends that BWCC nevertheless failed to effectuate that right by giving him unequivocal notice.[13] An offeree's power to accept an offer terminates upon, among other things, a revocation by the offeror. *Golkow v. Esquire Deposition Servs., LLC,* Civil Action No. 07-3355, 2009 WL 3030218, *4 (E.D. Pa. Sept. 23, 2009). "As with bilateral contracts, a party seeking to terminate a unilateral contract must provide 'clear and unambiguous' notice." *Id.* (quoting *Maloney v. Madrid Motor Corp.,* 122 A.2d 694, 696 (Pa. 1956)). "Thus, 'where the conduct of one having the right to terminate is ambiguous, he will be deemed not to have terminated the contract.'" *Id.* (quoting *Maloney,* 122 A.2d at 696).

---

[13] Some courts have held that disclaimer language that expressly disavows contractual rights or gives the employer sole discretion to modify or cancel plan terms at any time, with or without notice, precludes a finding of contractual intent. *See, e.g., Kavitz v. Int'l Bus. Machines, Corp.,* 458 F. App'x 18, 19-20 (2d Cir. 2012) (no manifestation of intent where employee incentive plan explicitly stated that it "does not constitute an express or implied contract or a promise by IBM to make any distributions under it" and reserved employer's right to adjust the plan terms up until incentive payments had been earned); *Barton v. Hewlett-Packard Co.,* Civil Action No. 13-554, 2014 WL 6966986, at *5 (W.D. Pa. Dec. 9, 2014) (no contract where employer could adjust or cancel the terms of the sales letters and change or discontinue the compensation policy "with or without notice, at any time"); *Diehl v. Elec. Data Sys. Corp.,* Civil Action No. 1:07-CV-1213, 2008 WL 2705540, at *4-5 (M.D. Pa. July 10, 2008) (no contractual intent where employer's short-term disability plan expressly stated it was intended as a "guideline," was not intended to convey "special rights or privileges," and reserved the employer's right to "change, modify, suspend, interpret or eliminate any provision… at any time, with or without notice"); *Rakos v. Skytell Corp.,* 954 F. Supp. 1234, 1237-38 (N.D. Ill. 1996) (no contract where employer retained the right to modify or cancel the plan "at any time without prior notice"). Here, the disclaimer language does not expressly disavow a contractual intent, or speak to the issue of notice; rather, the Old PTIP document is ambiguous about whether BWCC intended to reserve to itself the right to alter retroactively the plan terms without notice to the plan's participants. Where contractual terms are ambiguous, the issue of the parties' intent is for factfinder. *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.,* 905 A.2d 462, 468-69 (Pa. 2006).

In this case, there is a disputed issue with respect to whether BWCC effectively notified Zandier about the revocation of its alleged offer. Defendants presented evidence suggesting that the circumstances surrounding the changes to the PTIP were widely known, even by Zandier himself. (*See* Defs.' Ex. Y, ECF No. 45-25; Hines Dep. 32:10-13, 49:22-50:9, ECF No. 45-3.) Zandier, however, contends that he was never advised about BWCC's suspension from the Old PTIP or the changes to that plan until the fall of 2011 when, several months prior to his retirement, he received his PTIP payment and made inquiries. (Zandier Dep. at 52:5-55:4, 55:13-24, 57:17-59:13, 62:4-5, 66:4-13, 73:9-74:1, 74:19-75:7, ECF No. 45-1.) The court cannot resolve this dispute and Zandier's testimony, if credited, could support a reasonable inference that BWCC never terminated its offer to form a unilateral contract until after performance had occurred.

Under Pennsylvania law, a party's intent to contract is generally treated as a question of fact. *Adani Exports Ltd. v. AMCI Export Corp.*, Civil Action No. 05-304, 2007 WL 4298525, at *12 (W.D. Pa. Dec. 4, 2007) (citing *Viola v. Bocher*, 740 A.2d 1176, 1178 (Pa.1999)); *see EBC, Inc. v. Clark Bldg. Sys.,* Civil Action No. 05-CV-01549, 2007 WL 4563518, at *3 (W.D. Pa. Dec. 21, 2007) ("If ... the evidence surrounding the existence of a contract is ambiguous and susceptible to more than one reasonable interpretation, the issue of that contract's existence is a question of fact and therefore a motion for summary judgment must fail."). Viewing the evidence of record in the light most favorable to Zandier, a factfinder could reasonably determine that BWCC, through the conduct of its agents and the documents presented to Zandier, manifested an intent to enter into a binding unilateral contract to provide incentive bonuses under the terms of the Old PTIP, subject to various conditions and performance requirements, and subject to the Company's right to terminate or modify the plan upon notice prior to the

completion of performance. Because the present state of the record does not permit this court to conclude, as a matter of law, that Zandier lacked a contractual right to have his PTIP bonus administered under the terms of the Old PTIP, summary judgment will be denied with respect to Counts 1, 2, 5, 6, 14, and 15 of the amended complaint.

One final issue remains relative to Zandier's PTIP award. In his amended complaint, Zandier claims that the Fort Martin and Hatfield projects were completed in separate years and, therefore, BWCC incorrectly aggregated his bonus awards on the two projects for purposes of applying the PTIP award against the applicable salary cap. (Amended Compl. ¶¶ 27-28, 36-37, 57(c), 62(c), ECF No. 13.)

Upon review of the record, the court finds no genuinely disputed issue relative to BWCC's representation that the projects were both "completed" in the year 2011. In arguing that the PTIP awards should not have been aggregated, Zandier points to emails that, he claims, document when the Fort Martin and Hatfield units came on line. (Defs.' Ex. R, ECF No. 45-18.) According to Zandier, these documents show that the construction work for Fort Martin was completed in 2009 and the work for Hatfield was completed in early 2010. (Zandier Dep. 81-84.) Both the Old PTIP and the New PTIP, however, unambiguously provide that "project completion" is determined by reference to when final payment is received and all contractual obligations to the client have been satisfied; it is not determined by reference to the date on which the units came on line. (*See* Defs.' Ex. H at 2, §III ("Project completion will be defined as when final payment is received and all contractual obligations have been met to the satisfaction of the customer."), ECF No. 45-8; Defs.' Ex. P ("Project completion is defined as when final payment is received and all contractual obligations have been met."), ECF No. 45-16.) BWCC produced uncontested documentation showing that final payments were received and costs for

29

both projects were closed out as of June 2011, at which time the bonus payment process was initiated. (Defs.' Ex. S, ECF No. 45-19; Zandier Dep. at 84.) Accordingly, the record does not evidence a genuine dispute with respect to the year in which the Fort Martin and Hatfield projects were "completed" for purposes of the PTIP, *i.e.*, 2011. Whether or not Zandier has a valid contractual claim for payment under the Old PTIP, his payments were properly aggregated for purposes of applying the salary cap.

2. <u>Payments Made Under the Salaried Employee Incentive Plan</u>

In Counts 3 and 7 of the amended complaint Zandier asserts, respectively, breach of contract and WPCL claims based upon BWCC's failure to pay him a discretionary SEIP bonus for the year 2011. Zandier concedes that the SEIP had both discretionary and nondiscretionary components. (CCSMF ¶ 79.) He admits that he received his nondiscretionary bonus of $1,538 for the year 2011. (*Id.*; Defs.' Ex. FF, ECF No. 45-32.) Nevertheless, Zandier contends that BWCC was contractually obligated to pay him a discretionary bonus for 2011 as well. Initially, Zandier argues that the SEIP was an integral part of his employment contract with BWCC, but he provides no evidentiary support for this assertion.[14]

Alternatively, Zandier posits what appears to be an implied contract theory. He notes that he worked the entire calendar year in 2011 and, by all indications, exceeded his job requirements for that year and was critical to the Company's ability to secure a lucrative contract for the Berlin project. In addition, Zandier contends that his 2011 performance evaluation was consistent with

---

[14] The court notes that the record includes correspondence to Zandier confirming his acceptance of employment with the Company. (*See* Defs.' E, ECF No. 45-5.) The letter indicates that Zandier was being provided an orientation packet from PWPGG's human resources department and that he would be "eligible to receive [the] Company benefits outlined on the enclosed sheet effective the first day of the month <u>following [his] hire date,</u> (August 1, 1998)." (*Id.* (emphasis in the original).) Notably, however, the referenced enclosures are not part of the record.

his evaluation in 2010 – a year in which his SEIP bonus exceeded $7,400. He reasons that, "[g]iven BWCC's course of dealing with [him] by making significant SEIP Bonus payouts to him and with his contribution to acquiring a $125,000,000.00 contract in 2011, [he] had a rightful, contractual and legal expectation that BWCC would pay him a commensurate bonus, not the amount he actually received of $1,538.00." (Pl.'s Br. Opp. Mot. Summ. J. 16, ECF No. 49.)

Defendants posit that the Company denied Zandier an incentive award for 2011 because, by the time the awards were made in March 2012, Zandier had retired, and the Company opted instead to use the SEIP pool to incentivize active employees. Defendants argue that they are entitled to summary judgment on Counts 3 and 7 because Zandier had no contractual right to a discretionary bonus. The court agrees.

"'A contract, implied in fact, is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from their acts in the light of the surrounding circumstances.'" *Stephan v. Waldron Elec. Heating and Cooling LLC*, 100 A.3d 660, 668 (Pa. Super. Ct. 2014) (quoting *Home Protection Building & Loas Assoc.* Case, 17 A.2d 755, 756 (Pa. Super. Ct. 1940) (quoting *Cameron v. Eynon*, 3 A.2d 423 (Pa. 1939)). A course of dealing between the parties can give rise to an implied contract. *Id.* at 668-69 ("'An implied contract is an agreement which legitimately can be inferred from the intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men.'") (quoting *Hertzog v. Hertzog*, 29 Pa. 465, 468 (Pa. 1857).

In this case, the evidentiary record does not support the existence of any intent on the part of BWCC to be contractually obligated to pay Zandier the discretionary SEIP bonus he seeks.

As BWCC asserts and Zandier concedes, the discretionary component of the SEIP award was just that – discretionary, and supervisors could determine the size of the award or they could decide to make no award if they so choose.  (Zandier Dep. 38:16-24, ECF No. 45-1.)  The 2011 SEIP guidelines are marked "Business Sensitive," and they are addressed specifically to "SEIP Allocation Managers."  (Defs.' Ex. N, at 1, ECF No. 45-14.)  Zandier does not point to any evidence in the record suggesting that the Company provided these guidelines to employees other than the SEIP allocation managers.  On the contrary, Zandier alleged in his amended complaint that the 2011 SEIP guidelines were "in the sole possession" of the Company (Amended Compl. ¶ 50, ECF No. 13), and he could not recall ever being issued that document when he testified at deposition. (Defs.' Ex. N, ECF No. 45-14; Zandier Dep. 40:17-41:1, ECF No. 45-1).

This lack of evidence suggests that the SEIP provisions were intended as an internal corporate policy guideline, rather than as an embodiment of enforceable contractual terms. Zandier admitted that he did not know how the "mechanics" of the SEIP program worked, and he could not specifically recall seeing any documents related to program other than performance evaluations, which he understood to be relevant to the process.  (Zandier Dep. 37:21-38:15, 41:2-13, ECF No. 45-1.)  He does not allege that any representations or promises were made to him by company representatives concerning the award, if any, that he would receive for 2011. Finally, the evidence does not suggest a standard course of conduct relative to his past awards. While Zandier claims to have earned "pretty much" the same amount during the five or six years prior to 2012 (Zandier Dep. 44:9-11), BWCC's more specific discovery responses indicate that the awards for years 2004 through 2010 ranged from $3,762 to $7,424, including one year when

Zandier was awarded nothing, apparently due to a "freeze." (Defs.' Ex. GG at 4, ECF No. 51-1; Zandier Dep. 28:18-23, 34:5-9.)

Notwithstanding Zandier's subjective expectation of a SEIP award for 2011, any contractual intent in that regard must be discerned from the parties' objective manifestations. *California Sun Tanning USA, Inc. v. Electric Beach, Inc.*, 369 F. App'x 340, 346–47 (3d Cir. 2010) ("'In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter.'") (quoting *Espenshade v. Espenshade*, 729 A.2d 1239, 1243 (Pa. Super. Ct.1999)).   In addition, a contract, to be enforceable, must have sufficiently clear terms in order for a court to fashion a remedy.  *Legendary Art, LLC v. Godard*, 888 F. Supp. 2d 577, 585 (E.D. Pa. 2012); *Stephan v. Waldron Elec. Heating and Cooling LLC*, 100 A.3d 660, 665 (Pa. Super. Ct. 2014).  In this case, Zandier's reliance on his past SEIP awards would be insufficient for a reasonable factfinder to infer a contractual intent on the part of BWCC, especially when considered against other evidence in the record.  His proffered evidence fails as a matter of law to establish sufficiently definite contractual terms relative to the award of discretionary SEIP bonuses. Accordingly, summary judgment will be entered in favor of defendants with respect to Count 3 and 7 of the amended complaint.

### B.  Zandier's Promissory Estoppel Claim

In Count 4 of the amended complaint, Zandier asserts a claim of promissory estoppel against BWCC.  This claim is premised on the theory that BWCC induced Zandier to forego participation in the VRIF by virtue of language in the PTIP documents that led him to conclude mistakenly that participation in the VRIF could result in a forfeiture of his PTIP bonuses.  Under the VRIF terms, Zandier would have received severance pay in the amount of six months' salary

which, he claims, would have totaled $60,151.  (Amended Compl. ¶¶ 40-41, ECF No. 13.)[15]

Zandier points to provisions in the Old PTIP document which state that "[a] participant who is

laid-off or elects normal retirement will receive a pro-rata share of the bonus if the project earns

a bonus," whereas "[a] participant who is terminated for cause or resigns (prior to the end of the

project) will forfeit any portion of an unpaid bonus."  (Defs.' Ex. H, at 2, §III, ECF No. 45-8.)

The PTIP initiation forms that Zandier signed in May 2007 provide that "termination of

employment (other than layoff) will automatically terminate participation in this plan."  (Defs.

Ex. I, ECF No. 45-9; Ex. J, ECF No. 45-10.)   Zandier maintains that, based upon language in the

PTIP documents, he formed the impression that participation in the VRIF "would have

potentially made him ineligible for the [PTIP] bonus commission on the Fort Martin and Hatfield

Projects" (*id.* ¶44), so he did not exercise his option to participate in the VRIF.  (*Id.* ¶ 45.)

To maintain a promissory estoppel action a claimant must show that:  "'(1) the promisor

made a promise that [it] should have reasonably expected would induce action or forbearance on

the part of the promisee; (2) the promisee actually took action or refrained from taking action in

reliance on the promise; and (3) injustice can be avoided only by enforcing the promise.'"  *V-*

*Tech Servs., Inc. v. Street,* 72 A.3d 270, 276 (Pa. Super. Ct. 2013) (quoting *Crouse v. Cyclops*

*Indus.*, 745 A.2d 606, 611 (Pa. 2000)) (alteration in the original).  These elements are "strictly

enforced to guard against the 'loose application' of promissory estoppel."  *Peluso v. Kistner,* 970

A.2d 530, 533 (Pa. Commw. Ct. 2009) (quoting *Fried v. Fisher*, 196 A. 39, 43 (Pa. 1938)).  "The

change in the plaintiff's position must be substantial, and there is 'no injustice in being deprived

[15] In his brief in opposition to the pending motion, Zandier represents that his severance award would have totaled $58,200.  (*See* Pl.'s Br. Opp. Mot. Summ. J. 13, ECF No. 49.)

of a gratuitous benefit.'" *Id.* (quoting *Stelmack v. Glen Alden Coal Co.*, 14 A.2d 127, 130 (Pa. 1940)).

In this case, Zandier's promissory estoppel claim fails because he did not adduce sufficient evidence to establish an actionable promise on which he relied to his detriment. Zandier claims that he forwent the opportunity to obtain severance pay under the VRIF because he believed that acceptance of the VRIF option would jeopardize his ability to obtain PTIP bonus money. The PTIP documents on which Zandier relied, however, do not specifically discuss the VRIF and were generated by BWCC well before the VRIF ever came into existence. There were other representations on the part of BWCC included in the record concerning the interplay between the PTIP and the VRIF option. The VRIF notice that Zandier received in October 2009 makes no mention of the PTIP (*see* Defs.' Ex. L, ECF No. 45-12), but (as defendants note) it does provide information about how employees could have their questions about the VRIF answered. (*Id.* p. 3.) Although Zandier believed that VRIF participation would "potentially" make him ineligible for PTIP money (*see* Amended Compl. ¶ 44), he admittedly never sought clarification on this point and instead proceeded on the basis of his own interpretation of the documents. Under these circumstances, the evidence is insufficient for a reasonable factfinder to concluded that BWCC made a "promise" which it should have reasonably expected would induce Zandier to forego his VRIF option. *See Waterford Mtg. Co. v. Integrated Alarm Servs. Group, Inc.,* Civil Action No. 06-3967, 2008 WL 4589630, at *4 (E.D. Pa. Oct. 14, 2008) ("There is no estoppel when the plaintiff's actions were the result of his own will and judgment rather than the product of the defendants' representations.") (citing authority). At most, Zandier showed that the documents in question may have *implied* his ineligibility for PTIP bonus money in the event he separated from the Company under a program such as the VRIF. However, "an

implied promise is insufficient to assert a claim for promissory estoppel under Pennsylvania law." *Waterford Mtg. Co.,* 2008 WL 4589630, at *5 (citing *Edwards v. Wyatt,* 335 F.3d 216, 277 (3d Cir. 2003)).

In addition, Zandier failed to adduce sufficient evidence that he relied on the Company's "promise" to his detriment. *See Ndubizu v. Drexel Univ.,* 768 F. Supp. 2d 796, 801 (E.D. Pa. 2011) ("[A]ny action in reliance on a promise must be detrimental before a plaintiff can prevail on a promissory estoppel claim."). Here, Zandier framed his alleged detriment solely in terms of the severance pay which he lost when he passed up the opportunity to participate in the VRIF. (*See* Amended Compl. ¶¶ 40-41 (alleging that the VRIF offered an enhanced benefits package that included a severance package payable in a lump sum and equaling six months' pay); Pl.'s Br. Opp. Mot. Summ. J. 13 ("If Zandier had elected the VRIF he would have received in severance one-half of his 2009 salary...."), ECF No. 49.) As defendants point out, however, Zandier's decision to pass on the VRIF option resulted in his continued employment with the Company for an additional two years at his full salary, plus his receipt of PTIP bonus money and SEIP awards. From a financial standpoint, Zandier did not adduce sufficient evidence to show that he was harmed by his decision to remain employed by BWCC.[16] Because Zandier failed to adduce sufficient evidence to support the necessary elements of his promissory estoppel claim,

---

[16] In some cases, forbearance from other employment opportunities can constitute detrimental reliance; however, the plaintiff must typically show that other employment opportunities would have been available. *Ndubizu v. Drexel Univ.,* 768 F. Supp. 2d 796, 802 (E.D. Pa. 2011). The mere continuation of employment and refusal to seek other job prospects is insufficient to show detrimental reliance. *Ndubizu,* 768 F. Supp. 2d at 802; *see Ankerstjerne v. Schlumberger, Ltd.,* 155 F. App'x 48, 51-52 (3d Cir. 2005) (plaintiff failed to establish detrimental reliance where there was no evidence that the plaintiff had foregone other more lucrative opportunities). In this case, Zandier testified that he is currently receiving his full pension benefits from BWCC and is also employed by another company. (Zandier Dep. 8:16-9:24, 126: 5-9, EFC No. 45-1.) There is no suggestion by Zandier that he had a similar opportunity for employment with another company as of 2009 when he made his decision not to participate in the VRIF.

summary judgment will be entered in defendants' favor relative to Count 4 of the amended complaint.

## V.  Conclusion

Based upon the foregoing reasons, defendants' motion for summary judgment will be denied as to Counts 1, 2, 5, 6, 14 and 15 of the amended complaint.  The motion will be granted with respect to all other counts in the amended complaint.  An appropriate order will be entered.

By the Court,

*/s/ JOY FLOWERS CONTI*
Joy Flowers Conti
Chief U.S. District Judge

Dated: February  23, 2015